IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DERSE, INC., | ) | FILED: AUGUST 20, 2008 |
| | ) | 08CV4722 |
| Plaintiff, | ) | JUDGE HOLDERMAN |
| | ) No. | MAGISTRATE JUDGE MASON |
| vs. | ) | |
| | ) Judge | |
| | ) | TC |
| 3D EXHIBITS, INC., | ) | |
| | ) | Jury Demanded |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Derse, Inc. ("Derse"), by its undersigned attorneys, as its Complaint against defendant 3D Exhibits, Inc. ("3D"), alleges as follows:

### THE PARTIES

1. Derse is a corporation organized and existing under the laws of the State of Wisconsin, doing business in Illinois, with its principal place of business and headquarters located in Milwaukee, Wisconsin. Derse promotes businesses that market their products and services at trade shows by designing and installing marketing booths and related marketing materials for its clients.

2. 3D is an exhibit design, fabrication and management company organized and existing under the laws of the State of Illinois, doing business in Illinois and based in Elk Grove Village, Illinois.

### JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction of this action under 28 U.S.C. §1332 because plaintiff's citizenship is different from that of the defendant, and the matter in

controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and under 28 U.S.C. § 1367.

4. Venue in this district is proper under 28 U.S.C. §1391(a)(1) and (3) because 3D resides in this judicial district and is subject to *in personam* jurisdiction in this Court.

**GENERAL ALLEGATIONS**

5. Derse does business with customers across the United States.

6. The keys to Derse's success include several types of confidential information and trade secrets, such as: (1) confidential processes it has developed over the years; (2) current and potential client and customer information, other than the clients' names and addresses; (3) proprietary sales, marketing, financial and process implementation information; and (4) confidential information regarding its employees, including those employees' personal information.

7. The books and records of Derse, the confidential information contained therein, and the Derse customer account information, including buying history and preferences, are trade secrets of Derse subject to protection under the Illinois Trade Secrets Act.

8. Derse's customer information includes a compilation of information, including a listing of names, addresses and telephone numbers, buying history and preferences of Derse clients, as well as Derse financial and historical information, all of which are used in Derse's business and give Derse competitive advantage over other competitors who do not know the contents of this information. The detailed customer information and history compiled by Derse are valuable to Derse because they are not public knowledge and are not easily and/or legally obtained or duplicated by a competitor.

9.   Derse took affirmative steps to maintain the confidentiality of all such information, which were reasonable under the circumstances, including limiting access to such information to select individuals, keeping such information password-protected and/or under lock and key and restricting access to its network and electronic files to users with valid login ids and passwords.

**NELSON CORAZZARI WAS A SENIOR DERSE EXECUTIVE WHO HAD ACCESS TO DERSE'S CONFIDENTIAL INFORMATION AND TRADE SECRETS.**

10.   Corazzari was a highly compensated senior Derse sales executive who was employed by Derse for approximately 10 years as one of four Directors of Business Development for all of Derse's offices. He had account managers who reported to him and supported his sales. Corazzari was the primary contact for several of Derse's largest customers and potential customers. Not surprisingly, Corazzari had a "book of business" for Derse that totaled over $7 million in annual sales. Indeed, Corazzari had the highest sales in the Milwaukee division.

11.   As a Director of Business Development, Corazzari could and did access Derse's sales information including pricing, profit margin, cost, client, project files, and bid information. Moreover, Corazzari could and did access Derse's confidential business, marketing and financial information.

12.   Derse put Corazzari on notice as long ago as September 1999 that he would have access to Derse's confidential information and trade secrets and that he was not to disclose such information to anyone outside of Derse.

**FROM JULY 8, 2008 TO JULY 10, 2008 CORAZZARI DELETED DERSE COMPUTER PROGRAMS AND FILES FROM HIS LAPTOP, ACCESSED DERSE COMPUTER FILES USING EXTERNAL HARDDRIVES AND THEN ABRUPTLY RESIGNED ON JULY 10, 2008.**

13.  On or about July 10, 2008, Corazzari abruptly resigned his employment with Derse. He had given no indication that he was leaving and was purportedly on vacation the week before he resigned. Indeed, Corazzari said he had saved money and was not sure what he was going to do. When Corazzari resigned, he informed Derse that one of the portable external hard drives issued to him by Derse had "crashed," and that the Derse laptop he used while working for Derse (the "Laptop") malfunctioned and all the data on it was deleted.

14.  Derse's forensic review of the Laptop shows that several program files that can be used for information sharing were deleted from the Laptop just before Corazzari resigned. Upon information and belief, the deleted programs would not have been accidentally removed or caused by malfunction. Someone needed to either use a software removal program or Windows Explorer removal methods. The deleted information sharing files include: AOL Instant Messenger, AT&T Communication Manager, HP Image Sharing, Microsoft Broadband Networking, Blackberry, Safari (Web browser), Sonic (CD/DVD Writer), and Windows Live. Accordingly, Corazzari's electronic communication and information sharing programs and files were deleted from the Laptop. Thus, Corazzari's communications and information sharing files he sent and received on his Laptop are gone.

15.  Derse's forensic review of the Laptop shows that Microsoft Office files and Internet history files that would have been deleted in the ordinary course of business usage were removed from the Laptop using software designed to remove traces of such deleted files.

16. On numerous occasions before his resignation from Derse on July 10, 2008, Corazzari, upon information and belief, accessed, downloaded and/or copied certain computer files containing Derse's confidential and trade secret information. Indeed, Corazzari connected six external hard drive devices (thumb drives and USB drives) to the Laptop just before he resigned.

17. On July 8 and 9, 2008, Corazzari used USB hard drive devices to access files on the Laptop. Tellingly, the USB devices he used to connect to the Laptop were not issued to him by Derse, although Derse had issued two portable external hard drive devices to Corazzari in April 2008. Moreover, the two portable external hard drive devices Corazzari returned to Derse upon his resignation were not the devices he used to access his Laptop files on July 8th and 9th, respectively. In fact, the devices he returned to Derse are blank. The Thumb Drive Derse issued to Corazzari was "wiped" to remove all information and the other device (a Buffalo drive) had either never been used or had been "wiped" clean using a program.

18. At approximately 5:00 a.m. on July 10, 2008, Corazzari connected a digital camera to the Laptop. Derse uses images and photographs in its business to show its clients and prospective clients examples of its trade show marketing products. A digital camera can be used to transfer electronic files such as images and photographs from a computer.

19. Corazzari did not return to Derse any of the six USB drives or the digital camera he connected to the Laptop and did not tell anyone at Derse he had connected them to the Laptop.

20. Between July 8th and July 10th, Corazzari accessed several Derse files containing client information, bids, drawings, contracts and pricing. Indeed, some of the files Corazzari accessed contained bid opportunities that were happening at the time of his resignation.

**SUMMARY OF CORAZZARI'S COMPUTER ACTIVITY JUST BEFORE HE RESIGNED**

- Eight programs were deleted from the Laptop, thus removing hundreds of communication and information sharing files.

- Six external hard drives were attached to the Laptop just before Corazzari resigned.

- A digital camera was attached to the Laptop just before Corazzari resigned.

- The email file for the Laptop was removed just before Corazzari resigned.

- Corazzari accessed several Derse client, pricing, contract, and bidding electronic files and drawings just before he resigned.

21. Upon information and belief, Corazzari deleted Derse programs and electronic files so that no one could review his electronic communications and information sharing files. Moreover, he accessed Derse's electronic files so that he could copy Derse's confidential information, trade secrets and commercially valuable information to compete with Derse.

**CORAZZARI UNDERMINED DERSE'S OPPORTUNITIES TO WIN BIDS AND MAINTAIN BUSINESS RELATIONSHIPS.**

22. Upon information and belief, Corazzari acted to compete with Derse prior to and after his departure from Derse. While still employed by Derse, Corazzari took steps to insure Derse's bid price in a proposal to a longstanding client, NUANCE, was not lowered even though other members of Derse's management and sales team expressed a strongly held belief that the bid price be lower than what was bid. Derse learned later that it lost the bid to 3D, where Corazzari went to work after leaving Derse, which is described later. Derse also learned that its bid was apparently "dead last" because of price.

23. What is more, Corazzari transferred the installation and dismantling account from Sho-Link to a different company, 2nd Generation. Sho-Link is a co-operative owned in part by Derse and all Derse installation and dismantling work as a general rule goes through Sho-Link.

6

Contrary to those practices, Corazzari transferred certain installation and dismantling work for Derse's clients to 2nd Generation.

24.  Upon information and belief, Corazzari concealed a significant bid opportunity for a potential job for Andrew – a Commscope Company ("Andrew") - before he resigned.

25.  After Corazzari left Derse, Derse received an email to Corazzari's Derse email account from Andrew concerning a request for proposals ("RFP") it sent to Corazzari on May 14, 2008. No one at Derse was aware of the RFP even though Corazzari received the request in May. Typically, such proposal requests are routed to various employees at Derse to assemble information to prepare a bid. That was not done. The RFP provided potential bidders close to fifteen weeks to prepare their bids. When Derse learned of the RFP it was shortly before the bid was due, which greatly diminished its ability to prepare and submit a timely bid to Andrew. Tellingly, Corazzari accessed certain Derse electronic files concerning the RFP just before he resigned.

**3D CONSPIRED WITH CORAZZARI AND OTHER DERSE EMPLOYEES TO RAID DERSE'S EMPLOYEES.**

26.  3D has made it clear since March 2007 that it wants to acquire Derse. Indeed, in March 2007, 3D's President Gene Faut and Executive Vice President Robert Prihoda ("Prihoda") stated to Derse's CEO William Haney ("Haney") that 3D wants to acquire Derse. Haney told Prihoda Derse has no interest in being acquired by or merging with 3D at this time. Since then, 3D has secretly contacted Derse employees to cause them to leave Derse and/or encourage them to shift business away from Derse.

27.  3D responded to Derse's rebuff by soliciting at least nine Derse employees to work for 3D since at least June 2007.

28.  3D's solicitation method includes targeting Derse salespeople with signing bonuses ranging from $250,000 to $500,000 in exchange for those salespeople joining 3D and diverting their Derse accounts to 3D.

29.  For example, sometime prior to June 7, 2007 and continuing through July 2008, Prihoda contacted Derse Executive Vice President James Elser and offered Elser a $500,000 signing bonus with additional bonus payments for successful recruitment of other sales executives, including Derse employees, with books of business. Elser has sales contact with many Derse clients, and possesses proprietary information about those clients and Derse's practices.

30.  Further, prior to June 7, 2007, Prihoda contacted Corazzari and purportedly offered a signing bonus purportedly between $250,000-$500,000 to join 3D. As stated, Corazzari possesses substantial, proprietary information about many significant Derse clients.

31.  In or around November 2007, Prihoda solicited a Derse Director of Business Development offering him a substantial signing bonus to join 3D.

32.  The week of April 14-29, 2008, Derse's then Corporate Design Director Jon Horn vacationed in Europe with his spouse and visited two of Derse's largest clients, Genentech and Subzero, respectively. Derse paid a portion of Horn's travel expenses as Horn worked as the lead designer for these Derse accounts. Corazzari and Horn worked closely together while at Derse.

33.  On June 2, 2008, Corazzari's account manager at Derse, Ellen Keith, resigned from Derse giving 4 days notice. Keith worked for Derse for approximately 10 years and worked closely with Corazzari. Keith indicated to Derse representatives at the time she left that

she did not know what she would do next and was taking the summer off. On information and belief, Keith is now working with 3D.

34. The next day, on June 3, 2008, then Corporate Design Director Jon Horn notified Derse that he was resigning and his last day would be June 17, 2008. Horn informed Derse representatives he was not going to work for a competitor, but was starting his own business. However, he then also indicated that he would not perform work for Derse and, in an email to Genentech (a Derse client), he stated that he was leaving Derse amicably.

35. On June 13, 2008, Richard Frank, a Derse executive, notified Derse that he was resigning and his last day would be June 27, 2008. Frank informed Derse representatives that he intended to be a freelance detailer. Derse subsequently learned that Frank is now working for 3D.

36. On June 20, 2008, Prihoda contacted a Derse Vice President, Michael Bradley, and offered him a $300,000 salary to join 3D.

37. On July 10, 2008, Corazzari resigned from Derse.

38. On or about July 14, 2008, Derse learned that Horn is now working for 3D.

39. On or about July 28, 2008, Derse learned for the first time that Corazzari works at 3D.

40. Over recent months, as noted above, Derse employees have left Derse to work for 3D. In a conversation with 3D's Executive Vice President in or about December 2007, Haney told Prihoda that Derse was concerned that 3D was improperly raiding Derse's employees and accounts. In response, Prihoda told Haney that raiding Derse's and other competitors' employees and accounts was a part of 3D's business plan.

## COUNT I
### (Misappropriation Of Trade Secrets)

41. Derse repeats and incorporates the allegations contained in paragraphs 1 through 40 of this Complaint as if fully set forth in this Count I.

42. At all times relevant, there was in full force and effect the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065 *et seq.* Derse's trade secrets constitute valuable trade secrets as defined by the ITSA.

43. Derse's trade secrets are not generally known to the public at large or to the industry in which Derse does business. Derse's trade secrets are sufficiently secret such that Derse derives economic value from the fact that its trade secrets are not known to the public at large or to persons who can obtain economic value from their disclosure or use.

44. Derse takes efforts that are reasonable under the circumstances to maintain the confidentiality of its trade secrets.

45. As a direct and proximate result of Corazzari's employment relationship with 3D, Corazzari had access to and acquired knowledge of Derse's trade secrets.

46. The Illinois Trade Secrets Act obligates Corazzari to keep Derse's trade secrets confidential.

47. Upon information and belief, during Corazzari's employment with Derse and during his employment with 3D, Corazzari has misappropriated Derse's trade secrets by actual, threatened and inevitable disclosure of Derse's trade secrets to 3D without Derse's express or implied consent and with knowledge that he acquired the trade secrets with a duty to maintain their confidentiality.

48.     Given that 3D is a direct competitor of Derse, and that Corazzari is performing the same or similar duties with 3D that he performed while he was employed with Derse, Corazzari's employment with 3D, and his continued employment with 3D, have resulted and/or threaten to result in, and necessarily create the likelihood of, the inevitable disclosure of Derse's trade secrets to 3D.  Derse's trade secrets directly assist Corazzari in performing his duties with 3D and in competing with Derse and obtaining economic value from the disclosure or use of Derse's trade secrets.

49.     3D has acquired, or necessarily will acquire, Derse's trade secrets, resulting in misappropriation under the ITSA, and 3D has used and/or will use Derse's trade secrets to Derse's detriment.

50.     3D's use and disclosure, and inevitable use and disclosure, of Derse's trade secrets will cause, and has caused, Derse to suffer substantial and irreparable harm for which there is no adequate remedy at law.

51.     Consequently, 3D has violated, or will violate, the Illinois Trade Secrets Act.

52.     3D's actual, threatened, or inevitable use of Derse's trade secrets were and are willful and malicious.

53.     As a direct and proximate result of the foregoing actions of 3D, Derse has incurred damages, including, but not limited to, actual lost profits, lost customers, potential lost business opportunities, loss of employees and potential employees, and a disadvantaged market position in its competitive industry.  Derse will suffer additional irreparable damage unless 3D is enjoined by this Court from continued theft and use of Derse's trade secrets and reaping the benefits thereof.

54. 3D has been and/or will be unjustly enriched through its misappropriation of Derse's trade secrets.

## COUNT II
### (Inducement of Breach of Fiduciary Duty and Common Law Duties)

55. Plaintiff adopts and realleges paragraphs 1 through 54 as if fully set forth herein.

56. Corazzari was a Director of Business Development for Derse and, as a result, has certain fiduciary obligations to Derse, including a duty of loyalty and the duty to refrain from usurping Derse's business opportunities.

57. Corazzari's wrongful acts, misrepresentations, misappropriations, interferences and destructions described herein are breaches of Corazzari's fiduciary duty to Derse.

58. As an employee of Derse, Corazzari owed certain common law duties to Derse, including but not limited to, the duties of good faith and fair dealing, the duty of loyalty and the duty to refrain from undertaking or participating in activities damaging to or competitive with Derse.

59. While employed by Derse, Corazzari breached his duties to Derse by, among other things, procuring the means to compete with Derse through the appropriation of Derse's property without full disclosure of same and/or the nature and purpose of his activities to Derse, improperly entering into secret dealings with 3D and others in order to benefit himself and/or his outside business opportunities, misappropriating property of Derse and undertaking the other wrongful acts described herein.

60. Corazzari's conduct in facilitating and/or coordinating resignations by Derse employees with the intent to damage to Derse violates Corazzari's fiduciary duties to Derse. While Corazzari was free to terminate his employment with Derse, he is not entitled to divulge confidential information to competitors or potential competitors, or otherwise act to intentionally damage or injure Derse and/or its business relationships.

61. Corazzari violated his fiduciary duties arising from his relationship with Derse in that, while employed by Derse, he secretly planned and recruited others to leave the employ of Derse and become employees of 3D and schemed to deprive Derse of its clients, records and trade secrets.

62. While employed by Derse, Corazzari unlawfully negotiated and conspired to divert Derse's business and confidential information and trade secrets, and utilized Derse's time and resources to accomplish his goals and objectives.

63. In committing the foregoing acts, Corazzari acted willfully and wantonly, and with an utter indifference to Derse' rights.

64. 3D colluded with Corazzari in committing the breach of his fiduciary and common law duties owed to Derse.

65. Upon information and belief, 3D induced and knowingly participated in Corazzari's breach of his fiduciary and common law duties owed to Derse.

66. 3D knew or should have known that Corazzari's unlawful conduct for his own benefit and the benefit of 3D constituted a violation of his fiduciary and common law duties owed to Derse.

67. 3D has directly benefited from Corazzari's breach of his fiduciary and common law duties owed to Derse in that 3D has unlawfully obtained Derse's confidential information, trade secrets and business opportunities.

## COUNT III
### (Tortious Interference With Prospective Business Advantage)

68. Derse adopts and realleges paragraphs 1 through 67 as if fully set forth herein.

69. 3D has contacted clients of Derse and attempted to persuade them to cease doing business with Derse and instead enter into business with 3D.

70. Based on its history with these customers, Derse had a valid business expectancy that its relationships with its customers would continue and grow.

71. By its conduct, 3D, without privilege, has interfered with and induced Derse's customers to stop doing business with Derse, and has interfered with Derse's prospective economic relationships.

72. 3D also intentionally and unjustifiably interfered with Derse's at-will employment relationships by disparaging Derse and/or engaging in other wrongful conduct, including the solicitation of the many Derse employees it has hired away from Derse, preventing the realization of the business expectancy to Derse.

73. Upon information and belief, 3D was aware of Derse's business expectancy with its customers and employees.

74. 3D intentionally and unjustifiably has directly or indirectly contacted and solicited business from Derse's customers and, upon information and belief, wrongfully attempted to induce them to alter or terminate their present and prospective relationships with Derse, thereby interfering with Derse's present and prospective contractual and business relationships.

75. As 3D has knowledge and possession of Derse's confidential information and trade secrets, through its employment of Corazzari and other former key Derse employees, 3D has an unfair competitive advantage to interfere with Derse's opportunities to acquire new customers and/or new contacts with Derse's existing customers.

76. As a result of 3D's actions, Derse has suffered and will continue to suffer substantial loss and damage.

## COUNT IV
### (Civil Conspiracy to Commit Tortious Interference)

77. Derse adopts and realleges paragraphs 1 through 76 as if fully set forth herein.

78. 3D and Corazzari have acted together to build 3D's business based on Corazzari's breaches induced by 3D, the disclosure and use, and the additional inevitable disclosure, of Derse's confidential information and trade secrets, the solicitation and hiring of Derse employees, and the solicitation of Derse's customers.

79. 3D and Corazzari have knowingly and voluntarily agreed to conspire to build 3D's business unlawfully and to damage Derse's business through unlawful means.

80. 3D and Corazzari have continued this conduct, knowing that it is wrongful and in the face of demands that they cease forthwith.

81. By their conduct, 3D and Corazzari have caused substantial and ongoing damage to Derse.

**PRAYER FOR RELIEF**

WHEREFORE, Derse requests that this Court enter judgment against 3D providing for the following:

A.  a monetary judgment in an amount to be determined later;

B.  an Order that 3D pay Derse all damages suffered by Derse as a result of 3D's unlawful acts;

C.  an Order that 3D account for and pay Derse all gains, profits and savings 3D derived from its unlawful acts;

D.  an Order requiring 3D, its officers, agents, employees and all persons acting in concert with it, to return to Derse all of the property rightfully belonging to Derse that is in 3D's possession or under its control, including, but not limited to, all documents, materials, computer folders and files, and other data or information stored in any form whatsoever that it obtained from 3D by virtue of its employment of Corazzari or other former Derse employees;

E.  an Order requiring 3D, its officers, agents, employees and all persons acting in concert with it, from directly or indirectly, unlawfully hiring, soliciting or encouraging to terminate or alter a relationship with Derse, any employee, agent, independent contractor, client, supplier, customer or consultant of Derse;

F.  an Order requiring 3D, its officers, agents, employees and all persons acting in concert with it, from directly and indirectly, possessing, using or disclosing Derse's trade secrets and confidential information;

G.  an Order requiring 3D, its officers, agents, employees and all persons acting in concert with it, to make available to Derse or its representatives any computer hard-drive and other electronic storage device in 3D's custody or control for 3D's inspection and examination;

    H.    punitive damages;

    I.    costs of suit, including attorneys' fees, and interest; and

    J.    such other relief as the Court may deem just and equitable.

Dated: August 20, 2008

Respectfully submitted,

Derse, Inc., Plaintiff

By:    /s/Daniel A. Kaufman
         One Of Its Attorneys

**MICHAEL BEST & FRIEDRICH LLP**

James R. Troupis #3122247
One South Pinckney Street, Suite 700
P.O. Box 1806
Madison, Wisconsin  53701-1806
Telephone: (608) 257-3501
Facsimile:  (608) 283-2275

Daniel A. Kaufman #6194714
Laura Shroyer Liss #6231289
Michael Best & Friedrich LLP
Two Prudential Plaza
180 N. Stetson Ave., Suite 2000
Chicago, Illinois 60601
Telephone: (312) 222-0800
Facsimile:  (312) 222-0818

S:\CLIENT\025008\0099\C0875216.5